THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 794-1441
Facsimile: (858) 794-1450
kah@weiserlawfirm.com

Attorneys for Plaintiff

(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KEVIN FORESTAL, Derivatively on Behalf of STAAR SURGICAL COMPANY,<br><br>                              Plaintiff,<br><br>          vs.<br><br>BARRY G. CALDWELL, JOHN S. SANTOS, CAREN MASON, MARK B. LOGAN, STEPHEN C. FARRELL, RICHARD A. "RANDY" MEIER, JOHN C. MOORE, J. STEVEN ROUSH, LOUIS E. SILVERMAN, and WILLIAM P. WALL<br><br>                              Defendants,<br><br>          – and –<br><br>STAAR SURGICAL COMPANY,<br><br>                              Nominal Party. | Case No.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**NATURE OF THE ACTION**

1.      Plaintiff Kevin Forestal ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant STAAR Surgical Company ("STAAR" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from November 1, 2013 to the present (the "Relevant Period").

2.      According to its public filings, STAAR designs, develops, manufactures and sells implantable lenses for the eye as well as delivery systems used to insert the lenses into the eye.  The Company's lenses are used in corrective or "refractive" surgery as well as in surgery that treats cataracts.

3.      Prior to 2013, STAAR manufactured many of its lenses in a plant based in Switzerland.  Thereafter defendants decided to consolidate all of STAAR's manufacturing in one facility located in Monrovia, California.  To do so, however, defendants had to transfer and consolidate critically important documentation regarding the design and manufacture of the lenses, which the United States Food and Drug Administration ("FDA") required be maintained and updated to insure that the products were safe, effective and manufactured consistent with the originally approved designs.

4.      The consolidation efforts were a disaster as far as ensuring compliance with FDA regulations.[1]  Upon information and belief, the defendants caused the Company to have secretaries, who were supposed to just enter data, performing quality control inspections.  Similarly, upon

---

[1]      There is currently a related securities class action against STAAR and certain of the defendants named herein pending in the U.S. District Court for the Central District of California (the "District Court"), captioned *Todd v. STAAR Surgical Company, et al.*, Case No. 2:14-cv-05263-MWF-RZ (the "Securities Action").  On August 28, 2015, the plaintiffs to the Securities Action filed a Corrected Second Amended Complaint for Violations of the Federal Securities Laws (the "Securities Complaint").  On April 12, 2016, Honorable Michael W. Fitzgerald of the District Court denied defendants' motion to dismiss the Securities Complaint.  *See* ECF No. 134 in the Securities Action (the "Dismissal Decision").  While Plaintiff and his undersigned attorneys have conducted their own independent investigation of the wrongdoing alleged herein, such investigation has included review of the allegations in the Securities Action, including alleged statements attributed to Confidential Witnesses 2, 3 & 4 (the "CWs") that appear in the Securities Complaint.  Plaintiff also relies on the Dismissal Decision and the allegations in the Securities Complaint as part of the information and belief forming the basis of the allegations set forth herein.  As noted in the Dismissal Decision, the District Court gave due weight to the allegations based upon the "witnesses' descriptions" as to "knowledge of purported violations and intent to deceive . . . ." *Id.* at 14.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

information and belief, there were numerous instances of defects in the production process: protective seals peeling off lenses, lenses sticking together, cloudy lenses, and shards of glass within the lens bottles.

5.     Equally critical, when manufacturing began at in the Monrovia facility in October 2013 of the products previously manufactured in Switzerland, defendants caused the Company not to have, were unable to timely locate, and/or caused the FDA to make an observation that they did not have, crucially important Design History Files (or "DHFs").  *See e.g.* Dismissal Decision at 17.  This was known by defendant John S. Santos ("Santos"), the Vice President ("VP") of Regulatory Affairs, who was responsible for maintenance of these files and who reported directly to senior management.

6.     Despite these glaring regulatory failures, defendants reassured investors that the Company was in compliance with FDA regulations.

7.      In February 2014, the FDA commenced a routine inspection of the Monrovia facility. The FDA inspector repeatedly requested production of the DHFs.  Defendant Santos was responsible for producing them.  Upon information and belief, at no time were the files produced because they did not exist or could not be timely located by the defendants to provide to the FDA.  Indeed, defendants deliberately sought to mislead the FDA inspector each time requests were repeated by producing files purporting to be DHFs, which defendants knew were not.

8.     On March 21, 2014, the FDA inspection was concluded with a meeting between the FDA inspector and STAAR management.  At the time, the inspector noted fifteen separate violations of Current Good Manufacturing Practices ("CGMP"), including the absence of DHFs.  These findings were memorialized in a Form 483 that was also provided to Company management.  The results were immediately conveyed to STAAR senior officers, including defendants Santos and Chief Executive Officer ("CEO") Barry G. Caldwell ("Caldwell").

9.     Thereafter, STAAR personnel scrambled to respond to the inspection report.  Since the DHFs did not exist (or could not be timely located for production to the FDA), this and other violations were incurable.

- 2 -

10.     Not surprisingly, the FDA formally issued a Warning Letter to the Company on May 21, 2014.  The import of this Warning Letter was devastating to the Company's business prospects.  It effectively meant that until these violations were resolved, the FDA would not approve any of STAAR's pending applications for marketing new medical devices.

11.     Shockingly, and indicative of their consistent intent to mislead investors, defendants did not disclose the issuance of this Warning Letter.  Indeed, the Warning Letter was not disclosed until June 30, 2014, when it was published on the FDA's website and read by analysts.

12.     Upon this news, STAAR stock price plummeted $2.95, or 17.5%, to close at $13.85 on July 2, 2014.

13.     Throughout the Relevant Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.   In particularly, during the Relevant Period, defendants falsely represented that STAAR was in compliance with FDA regulations, including CGMP, and failed to disclose (1) pervasive, serious and known material violations of regulations issued by the FDA at STAAR's manufacturing facility in Monrovia, California; (2) reports of these violations conveyed by FDA personnel during and at the conclusion of an inspection of Monrovia facility in February - March 2014; and (3) the issuance of a formal Warning Letter by the FDA on May 21, 2014 with regard to these violations.

14.     As a result of defendants' false statements, STAAR's stock traded at artificially inflated levels.  Further, as a result of defendants' breaches, the price of the Company's stock still has not recovered and currently trades for around $5.60 per share.

15.     Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

- 3 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

17.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district. Additionally, nominal defendant STAAR is headquartered in this district.

**THE PARTIES**

18.     Plaintiff is a shareholder of STAAR and has continuously held STAAR stock since 2012.  Plaintiff is a citizen of Illinois.  Pursuant to Cal. Corp. §800, Plaintiff, via his undersigned counsel, delivered a copy of this complaint to STAAR prior to its filing with the Court.

19.     Nominal defendant STAAR is a Delaware corporation with its executives offices located at 1911 Walker Avenue, Monrovia, CA 91016.  According to its public filings, the Company designs, develops, manufactures and sells implantable lenses for the eye as well as delivery systems used to insert the lenses into the eye.

20.     Defendant Caldwell served as the Company's CEO and President from November 2007 until March 2015 and also served as its Principal Executive Officer.  Upon information and belief, defendant Caldwell is a citizen of Texas.

21.     Defendant Santos has served as the Company's VP, Global Quality Assurance, Regulatory and Clinical Affairs since November 2008.  Previously, defendant Santos served as the Company's VP of Corporate Planning and Development from August 2001 until November 2008.  Prior to that he served as VP Finance and Chief Financial Officer ("CFO") from May 2000 to August 2001, as VP Controller from March 1999 to May 2000, and as Controller from October 1992 to March 1999. As VP of Regulatory Affairs, defendant Santos was consulted and responsible for any statements concerning FDA regulatory compliance.  Upon information and belief, defendant Santos is a citizen of California.

- 4 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

22.     Defendant Caren Mason ("Mason") has served as the CEO and President of the Company since March 2015.  Additionally, defendant Mason has served as a director of the Company since June 2014.  Upon information and belief, defendant Mason is a citizen of California.

23.     Defendant Mark B. Logan ("Logan") has served as Chairman of the Board from November 2010.  Upon information and belief, defendant Logan is a citizen of Virginia.

24.     Defendant Stephen C. Farrell ("Farrell") has served as a director of the Company since January 2016.  Upon information and belief, defendant Farrell is a citizen of Massachusetts.

25.     Defendant Richard A. "Randy" Meier ("Meier") has served as a director of the Company since June 2009.  In addition, defendant Meier served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Meier is a citizen of Pennsylvania.

26.     Defendant John C. Moore ("Moore") has served as a director of the Company since January 2008.  In addition, defendant Moore served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Moore is a citizen of Virginia.

27.     Defendant J. Steven Roush ("Roush") has served as a director of the Company since April 2015.  In addition, defendant Roush served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Roush is a citizen of California.

28.     Defendant Louis E. Silverman ("Silverman") has served as a director of the Company since September 2014.  Upon information and belief, defendant Silverman is a citizen of California.

29.     Defendant William P. Wall ("Wall") has served as a director of the Company since September 2015.  Upon information and belief, defendant Wall is a citizen of Massachusetts.

30.     Collectively, defendants Caldwell, Santos, Mason, Logan, Farrell, Meier, Moore, Roush, Silverman, and Wall shall be referred to herein as the "Defendants."

31.     Collectively, defendants Meier, Moore, and Roush shall be referred to herein as the "Audit Committee Defendants."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

**DEFENDANTS' DUTIES**

32.     By reason of their positions as officers, directors, and/or fiduciaries of STAAR and because of their ability to control the business and corporate affairs of STAAR, Defendants owed STAAR and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage STAAR in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of STAAR and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to STAAR and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     Defendants, because of their positions of control and authority as directors and/or officers of STAAR, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with STAAR, each of the Defendants had knowledge of material non-public information regarding the Company.

34.     To discharge their duties, the officers and directors of STAAR were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of STAAR were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1        (c)     When put on notice of problems with the Company's business practices and

2  operations, exercise good faith in taking appropriate action to correct the misconduct and prevent

3  its recurrence.

4        35.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are

5  required, *inter alia*, to:

6        (a)     Review and discuss with management the annual audited financial statements and

7  quarterly financial statements;

8        (b)     Discuss with management the Company's policies with respect to risk

9  assessment and risk management;

10        (c)     Review and consult with management the integrity of the Company's financial

11  reporting process;

12        (d)     Review with management on an annual basis the Company's disclosure controls

13  and procedures, including any significant deficiencies in, or material noncompliance with, such controls

14  and procedures;

15        (e)     Perform a review and evaluation, at least annually, of the performance of the

16  committee;

17        (f)     Review periodically the effect of accounting initiatives on the financial

18  statements of the Company; and

19        (g)     Discuss with management an outline of press releases or announcements

20  regarding results of operations as well as general policies on earnings guidance to be provided to

21  analysts, rating agencies and the general public, and review any relevant items with management prior

22  to release of any such press releases or earnings guidance including the use of "pro forma" or

23  "adjusted" non-GAAP information.

24                **SUBSTANTIVE ALLEGATIONS**

25  **A.**    **<u>Background of the Company</u>**

26        36.    According to its public filings, STAAR designs, develops, manufactures and sells

27  implantable lenses for the eye and delivery systems used to place lenses into the eye.  All of the lenses

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1   the Company manufactures are foldable, which permits the surgeon to insert them through a small

2   incision during minimally invasive surgery.  STAAR operates its global administrative headquarters

3   and the manufacturing facility in Monrovia, California.

4          37.     STAAR is a relatively small company with only 335 full time employees.  It was

5   founded in 1982 with the goal of creating and manufacturing the world's first foldable intraocular lens

6   (or "IOL") for cataract surgery.  As the company grew, it expanded its focus to include refractive

7   surgery and glaucoma treatments using its Implantable Collamer Lens (or "ICL").  STAAR's IOLs and

8   ICLs are subject to FDA regulation.

9          38.     In 1993, STAAR began feasibility studies on a phakic IOL, referred to as an implantable

10   contact lens.  Although, the Company's products were marketed in other countries, for many years the

11   Company had been unable to secure FDA approval for any of its products.  Finally, in 2005 the

12   Company received FDA approval for the Visian ICL.  There are three models of the Visian ICL

13   available outside the United States: one to treat myopia (nearsightedness), one to treat myopia with

14   astigmatism, and one to treat hyperopia, or farsightedness.  However, only the myopic version (VISIAN

15   Myopic ICL or "MICL") has received FDA approval.  The Visian Toric ICL (or "TICL"), which treats

16   myopia with astigmatism, is currently under review with the FDA.

17          39.     Competition in the ophthalmic surgical product market is intense and is primarily driven

18   by technological innovation and the regulatory approval required to commercialize it in the key markets

19   around the world.  To remain competitive, companies such as STAAR must devote continued efforts

20   and significant financial resources to enhance their existing products and to develop new products.

21          40.     In the refractive market, STAAR's ICL technology competes with other elective surgical

22   procedures such as laser vision correction or LASIK, for those consumers who are looking for an

23   alternative to eyeglasses or contact lenses to correct their vision.  STAAR's primary competition in

24   selling the ICL to patients seeking surgery to correct refractive conditions lies not in similar products to

25   the ICL, but in these much better known and widely available laser surgical procedures.  The companies

26   that offer LASIK have much greater financial resources than STAAR does and some of them have large

27   international markets for a full suite of ophthalmic products.  Their greater resources for research,

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

development and marketing, and their greater capacity to offer comprehensive products and equipment to providers make it difficult for STAAR to compete.

41.     As Defendants acknowledged in the Company's filings with the U.S. Securities and Exchange Commission ("SEC"), STAAR had lost significant market share in IOL sales to some of its competitors, and its future profitability is challenged by the competitive nature of its industry.  From 2000 to 2013, Defendants caused STAAR to report losses from continuing operations for all but two years.  As of January 3, 2014, Defendants had caused STAAR to accumulate a deficit of $132.1 million.  It was critical for the Company that its next product, the TICL, gain FDA approval.

42.     STAAR used to manufacture its products in four facilities worldwide – Nidau, Switzerland, Ichikawa City, Japan, Aliso Viejo, California, and Monrovia, California.  In 2011, Defendants developed and initiated a project to consolidate STAAR's global manufacturing into a single site at the Monrovia facility, known as "Project Comet."  In June 2013, Defendants caused the Company to expand the Monrovia facility.  Also in 2013, Defendants caused STAAR to complete transferring IOL manufacturing from Japan to the Monrovia facility.  In October 2013, Defendants caused the Company to transferred ICL manufacturing from Switzerland to the Monrovia facility.

**B.     The FDA Regulatory Regime**

     **1.     FDA's Medical Device Approval Process**

43.     Under the federal Food, Drug & Cosmetic Act, as amended (the "Act"), the FDA has the authority to regulate, among other things, the design, development, manufacturing, preclinical and clinical testing, labeling, product safety, marketing, sales, distribution, pre-market clearance and approval, recordkeeping, reporting, advertising, promotion, post-market surveillance, and import and export of medical devices.

44.     Each medical device commercially distributed in the United States must first receive clearance to market under a notification submitted pursuant to Section 510(k) of the Act, known as the 510(k) premarket notification, or pre-market approval (or "PMA") from the FDA, unless specifically exempted by the agency.  The FDA classifies all medical devices into one of three classes.  The FDA establishes procedures for compliance based upon the device's classification as Class I (general

controls, such as establishment registration and device listing with FDA, labeling and record-keeping requirements), Class II (performance standards in addition to general controls) or Class III (pre-market approval required before commercial marketing).  Devices deemed to pose lower risk are categorized as either Class I or II, which require the manufacturer to submit to the FDA a 510(k) pre-market notification requesting clearance of the device for commercial distribution in the United States.  Some low risk devices are exempt from this requirement.  Class III devices are deemed by the FDA to pose the greatest risk and are the most extensively regulated.  These devices include life-supporting, life sustaining, or implantable devices, or devices deemed not substantially equivalent to a previously 510(k) cleared device.  The effect of assigning a device to Class III is to require each manufacturer to submit to the FDA a PMA that includes information on the safety and effectiveness of the device.  The FDA reviews device applications and notifications through its Office of Device Evaluation (or "ODE").  STAAR's OCL and ICL devices are Class III medical devices subject to the PMA approval process.

45.     When 510(k) clearance is not available, the more rigorous PMA process requires a manufacturer to demonstrate independently that the new medical device is safe and effective for its intended use.  A PMA must be supported by, among other things, extensive technical, pre-clinical, clinical testing, manufacturing and labeling data to demonstrate to the FDA's satisfaction the safety and effectiveness of the device.

46.     After a PMA application is submitted and filed, the FDA begins an in-depth review of the submitted information.  During the review period, the FDA may request additional information or clarification of information already provided.

47.     In addition to its own review, the FDA is authorized to convene an Advisory Panel consisting of industry experts to opine on the advisability of approval of a PMA.  Specifically the FDA Ophthalmic Devices Panel of Medical Devices Advisory Committee reviews and evaluates data concerning the safety and effectiveness of marketed and investigational devices for use in the eye and makes recommendations to the Commissioner of the FDA.  The Advisory Panel's recommendation is advisory in nature, and the final decision on whether to approve a PMA rests solely with the FDA.

- 10 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

48. The FDA will also conduct a pre-approval inspection of the manufacturing facility to ensure compliance with Quality System Regulation which requires critically important design development, testing, control, documentation and other quality assurance procedures in the design and manufacturing process.

49. Both before and after pre-market clearance or approval and release of a product commercially, the manufacturer has ongoing responsibilities under FDA regulations. The FDA reviews design and manufacturing practices, labeling and record keeping, and manufacturers' required reports of adverse experiences and other information to identify potential problems with marketed medical devices. The manufacturer is also subject to periodic inspection by the FDA for compliance with the FDA's CGMP regulations for medical devices. These regulations govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging and servicing of all finished medical devices intended for human use.

50. If the FDA concludes that a manufacturer is not in compliance with applicable laws or regulations, or that any of its medical devices are ineffective or pose an unreasonable health risk, the FDA could require the company to notify health professionals and others that the devices present unreasonable risk or substantial harm to public health, order a recall, repair, replacement, or refund of the devices, detain or seize adulterated or misbranded medical devices, or ban the medical devices. The FDA may also issue warning letters or untitled letters, refuse the company's pending or future requests for 510(k) clearance or PMA approval, revoke existing 510(k) clearances or PMA approvals previously granted, impose operating restrictions, enjoin and restrain certain violations of applicable law pertaining to medical devices and assess civil or criminal penalties.

**2. The FDA's Regulatory Regime for Compliance with CGMP and Quality System Regulations**

51. Manufacturers must establish and follow quality systems to ensure that their products consistently meet applicable requirements and specifications. As discussed above, the Quality System Regulations for FDA-regulated products (food, drugs, biologics, and devices) are also known as CGMP.

52. CGMP requirements for devices in part 820 (21 CFR part 820) were first authorized by section 520(f) of the Act. In 1990, FDA undertook the start of the revision of the CGMP regulation to

- 11 -

1  add the design controls authorized by the Safe Medical Devices Act.  Also, to ensure that good quality

2  assurance practices are used for the design of medical devices and that they are consistent with quality

3  system requirements worldwide, the FDA revised the CGMP requirements by incorporating them into

4  the Quality System Regulation, 21 CFR Part 820.   An important component of the revision is the

5  addition of "design controls."

6       53.    FDA's Quality System Regulation describes the "essential elements of a quality system"

7  – such as verification and validation of a device's design with objective evidence, as well as

8  maintenance of a "Design History File" documenting the device's development.  The Quality System

9  Regulation provides the framework within which the manufacturer must "develop and implement

10  specific procedures tailored to their particular processes or devices."

11       54.    Because the regulation must apply to so many different types of devices, the regulation

12  does not prescribe in detail how a manufacturer must produce a specific device.  Rather, the regulation

13  provides the framework that all manufacturers must follow by requiring that manufacturers develop and

14  follow procedures and fill in the details that are appropriate to a given device according to the current

15  state-of-the-art manufacturing for that specific device.

16       55.    The Quality System Regulation applies to finished device manufacturers who intend to

17  commercially distribute medical devices.  It is the responsibility of each manufacturer to establish

18  requirements for each type or family of devices that will result in devices that are safe and effective, and

19  to establish methods and procedures to design, produce, distribute, etc. devices that meet the quality

20  system requirements.  The responsibility for meeting these requirements and for having objective

21  evidence of meeting these requirements may not be delegated even though the actual work may be

22  delegated.

23           a.    **Design Controls**

24       56.    Design controls are the critical component of a comprehensive quality system that covers

25  the life of a device.  The assurance process is a total systems approach that extends from the

26  development of device requirements through design, production, distribution, use, maintenance, and

27  eventually, obsolescence.  Design control begins with development and approval of design inputs, and

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1   includes the design of a device and the associated manufacturing processes.  Design control does not

2   end with the transfer of a design to production.  Design control applies to all changes to the device or

3   manufacturing process design, including those occurring long after a device has been introduced to the

4   market.

5          57.     Each manufacturer of any Class II or Class III device is required to establish and

6   maintain procedures to control the design of the device in order to ensure that specified design

7   requirements are met.  The essential quality aspects and the regulatory requirements, such as safety,

8   performance, and dependability of a product (whether hardware, software, services, or processed

9   materials) are established during the design and development phase.  Deficient design can be a major

10  cause of quality problems.

11         58.     Since early 1984, FDA has identified lack of design controls as one of the major causes

12  of device recalls.  The intrinsic quality of devices, including their safety and effectiveness, is established

13  during the design phase.  Thus, FDA has concluded that "unless appropriate design controls are

14  observed during preproduction stages of development, a finished device may be neither safe nor

15  effective for its intended use."  *Quality System Regulation* (October 7, 1996).[2]

16         59.     The FDA requires that the context within which product design is to be carried out must

17  be set by the manufacturer's "senior management."  *See Design Control Guidance For Medical Device*

18  *Manufacturers* (March 11, 1997).[3]  It is their responsibility to establish a design and development plan

19  which sets the targets to be met.  *Id.*  Senior management needs to decide how the design function is to

20  be managed and by whom.  *Id.*  Senior management should also ensure that internal policies are

21  established for design issues.  *Id.*

22         60.     Manufacturers of medical devices are also required to maintain procedures for verifying

23  the device design, which must confirm that design output meets design input requirements, and for

24  _____

25  [2]     *Available    at    http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/*
PostmarketRequirements/QualitySystemsRegulations/ucm230127.htm.

26  [3]     *Available    at    http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/*
27  GuidanceDocuments/ucm070627.htm.  ("FDA Design Control Guidance"), *Discussion and Points to*
*Conside*r.

28                                                  - 13 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

validating the device design, which must be performed on initial production units and which must ensure that devices conform to designed user needs and intended uses. *See Id.*; 21 CFR § 820.30(a)-(j). The results of the design verification and validation must also be documented (*id.*; § 820.30(f)-(g)), and a Design History File must be established and maintained to demonstrate "that the design was developed in accordance with the approved design plan." *Id.* § 820.30(j). Some of the key design controls necessary to ensure the safety and effectiveness of a medical device are as follows:

(i) **Design and Development Planning.** Each manufacturer is required to establish and maintain plans that describe the design and development activities and define responsibility for implementation. The plans must be reviewed, updated, and approved as design and development evolves. The design and development plan may include a schedule showing starting and completion dates for each major task, project milestone, or key decision points. It is important that the schedule be updated to reflect current knowledge. At all times, the plan should be specified at a level of detail enabling management to make informed decisions, and provide confidence in meeting overall schedule and performance objectives. This is important because scheduling pressures have historically been a contributing factor in many design defects which caused injury. *See* FDA Design Control Guidance, 21 CFR § 820.30(b).

(ii) **Design Input.** Each manufacturer is required to establish and maintain procedures to ensure that the design requirements relating to a device are appropriate and address the intended use of the device, including the needs of the patient. Design input is the starting point for product design. The requirements which form the design input establish a basis for performing subsequent design tasks and validating the design. Therefore, development of a solid foundation of requirements is the single most important design control activity. Eventually, the design input must be reviewed for adequacy. After review and approval, the design input becomes a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

controlled document.  All future changes will be subject to the change control procedures.  *See* FDA Design Control Guidance, 21 CFR § 820.30(c).

(iii)    **Design Output.**  Design output means the results of a design effort at each design phase and at the end of the total design effort.  The finished design output is the basis for the device master record.  The total finished design output consists of the device, its packaging and labeling, and the device master record. Each manufacturer must establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.  Design output should identify the characteristics of the design that are crucial to the safety and proper functioning of the device.  Design output includes production specifications (drawings and documents used to procure components, fabricate, test, inspect, install, maintain, and service the device) as well as descriptive materials which define and characterize the design.  *See* FDA Design Control Guidance, 21 CFR § 820.30(d).

(iv)    **Design Review.** Design review means a documented, comprehensive, systematic examination of a design to evaluate the adequacy of the design requirements, to evaluate the capability of the design to meet these requirements, and to identify problems. Each manufacturer must establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.  *See* FDA Design Control Guidance, 21 CFR § 820.30(e).

(v)    **Design Verification.** Each manufacturer is also required to establish and maintain procedures for verifying the device design. Design verification confirms that the design output meets the design input requirements. The results of the design verification, including identification of the design, method(s), the date, and the individual(s) performing the verification, must be documented in the Design History File. *See* FDA Design Control Guidance, 21 CFR § 820.30(f).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

(vi) **Design Validation.** Each manufacturer must also establish and maintain procedures for validating the device design. Whereas verification is a detailed examination of aspects of a design at various stages in the development, design validation is a cumulative summation of all efforts to assure that the design will conform with user needs, given expected variations in components, materials, manufacturing processes, and the use environment. Validation may expose deficiencies in the original assumptions concerning user needs and intended uses. Design validation must include testing of production units under actual or simulated use conditions. The results of the design validation, including identification of the design, method(s), the date, and the individual(s) performing the validation, shall be documented in the Design History File. *See* FDA Design Control Guidance, 21 CFR § 820.30(g).

(vii) **Design Transfer.** Each manufacturer must establish and maintain procedures to ensure that the device design is correctly translated into production specifications. Production specifications must, in turn, ensure that manufactured devices are repeatedly and reliably produced within product and process capabilities. If a manufactured device deviates outside those capabilities, performance may be compromised. Thus, the process of encapsulating knowledge about the device into production specifications is critical to device quality. *See* FDA Guidance, 21 CFR § 820.30(h).

(viii) **Design History File.** Each manufacturer must also establish and maintain a Design History File for each type of device. Design History File means a compilation of records which describes the design history of a finished device. The Design History File must contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements of this part. *See* FDA Design Control Guidance, 21 CFR § 820.30(f). The failure to maintain a Design History File can result in the product being subjected to a mandatory recall. *See id.*, Discussion and Points to Consider.

- 16 -

**b.**     **Additional Quality System Regulations**

61.     **Production and Process Controls.**   The Quality System Regulation requires manufacturers to validate the production process with a high degree of assurance to ensure that a device conforms to its specifications, when such a process cannot be fully verified by subsequent inspections and tests.  *See* 21 CFR § 820.75.  The validation activities and results must also be documented.  *Id.*

62.     **Complaint Processing.**  The Quality System Regulation requires manufacturers to have procedures in place for handling complaints, which includes conducting an investigation whenever information suggests that a device may have failed to meet any of its specifications.  *See* 21 C.F.R. § 820.198.

63.     **Finished Device Acceptance.**  A manufacturer must establish and maintain procedure for inspections, tests, or other verification activities, often referred to as "acceptance activities." Specifically, a manufacturer is required to establish procedures to ensure that each production run, lot, or batch of finished devices meets established criteria. Finished devices cannot be distributed and must be held in quarantine until these criteria are met. *See* 21 C.F.R. § 820.80(d).

64.     **Purchasing Controls.**  A manufacturer must also establish and maintain procedures to ensure that all purchased products conform to specified requirements need to accurately manufacturer the medical device.  *See* 21 C.F.R. § 820.50.

65.     **Maintenance of Records.**  Similar to the Design History File requirement, all records created in the course of the above discussed regulations as well as all records required by FDA Quality System Regulation must be maintained by the manufacturer "at the manufacturing facility." 21 C.F.R. § 820.180. The manufacturer is also required to "make these records readily available for review and copy by FDA employees."  *Id.*

**3.**     **The FDA Inspection Process**

**a.**     **The Purpose of Inspections**

66.     The FDA's purpose in inspecting facilities for compliance is to "[p]rotect[] consumers and enhanc[e] public health by maximizing compliance of FDA regulated products and minimizing risk associated with those products."     *See* Inspections, Compliance, Enforcement, and Criminal

Investigations (Dec. 16, 2011).[4]  The FDA conducts inspections of establishments that manufacture, process, pack, or hold FDA-regulated products, before approving products and/or after products are on the market, to determine the establishment's compliance with laws administered by FDA.  *About FDA Inspections*.[5]  "An establishment inspection is a careful, critical, official examination of a facility to determine its compliance with laws administered by FDA."  *FDA Investigations Operations Manual* 5.1.2 (2012) ("Operations Manual").[6]

67.  During inspections of manufacturing facilities like those at STAAR, the FDA ensures the quality of medical devices by carefully monitoring manufacturers' compliance with the FDA's CGMPs regulations.  CGMPs are not aspirational or model policies: according to the FDA, "the regulations promulgated under 21 CFR 820 establish minimum requirements applicable to finished devices." Operations Manual 5.6.2.

### b.   The Method of Inspections

68.  The FDA is required to inspect manufacturing facilities at least once every two years. 21 U.S.C. § 360(h); 21 CFR § 312. These are called GMP inspections. Jonathan Berman, Current Trends in FDA's Enforcement of GMP Requirements (Mar. 2013).[7]

69.  FDA investigators may or may not give notice prior to arriving onsite at a manufacturing facility to conduct an inspection.  Operations Manual 5.2.1.1. When FDA staff perform an investigation, they arrive onsite and begin by handing a Form 482 Notice of Inspection "to the top management official" on the first day of the inspection.  Operations Manual 5.1.1.3. A Form 482 states the basis for the FDA's authority to conduct an investigation. At all times that investigators roam the facilities, they are accompanied by the investigated company's management representative.  The "management

---

[4]   *Available at* http://www.fda.gov/ICECI/ Inspections/IOM/ ucm124442.htm.

[5]   *Available   at*   http://www.fda.gov/AboutFDA/Transparency/PublicDisclosure/ DraftProposalbyTopicArea/ucm211861.htm.

[6]   *Available at* http://www.fda.gov/iceci/inspections/iom/default.htm.

[7]   *Available   at*   http://www.lexology.com/library/detail.aspx?g=046878c8-7e97-408c-8467-869d34bd566d.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

representative" is "is responsible for ensuring the quality system is effectively established and maintained, and who will report on its performance to management with executive responsibility for review." *FDA Inspection Guide, Management Controls*.[8]

70.     Trained investigators tour facilities, accompanied at all times by the inspected company's representative, and "cite factual observations of significant deviations from the FD&C Act [21 U.S.C. 301], PHS Act, 21 CFR, and other acts where FDA has enforcement authority." Operations Manual 5.2.3.2. Investigators note facts that, in their judgment, constitute violations of FDA standards. *Id.* at 5.2.3. These findings are recorded in a concise Form 483 (explained below), which is presented and thoroughly explained to management on the last day of inspection. Prior to presentation of the Form 483 on the last day, investigators and analysts are instructed to "make every reasonable effort to discuss all observations with the management of the establishment as they are observed or on a daily basis, to minimize surprises, errors, and misunderstandings when the FDA [Form] 483 is issued" at the end of the inspection process. *Id.* (emphasis added).

71.     If objectionable conditions are observed during the inspection, investigators provide the owner of the establishment with a document, called an FDA Form 483, on the last day of the inspection. The purpose of the FDA Form 483 is to "notif[y] the company's management of objectionable conditions." FDA, Form 483 FAQs.[9] A Form 483 "is intended for use in notifying the inspected establishment's **top management** in writing of **significant objectionable conditions**, relating to products and/or processes, or other violations of the FD&C Act and related Acts [] which were observed during the inspection." Operations Manual 5.2.3 (emphasis added); *id.* at 5.2.3.1 (Normal protocol states that Form 483 "should be issued at the conclusion of the inspection and prior to leaving the premises."). The FDA instructs its investigators that all observations recorded in a Form 483 "should be significant and correlate to regulated products or processes being inspected" and that the "observations should be ranked in order of significance" as listed on the form. *Id.* at 5.2.3.

---

[8]     *Available at* http://www.fda.gov/iceci/inspections/inspectionguid es/ucm170207.htm.

[9]     *Available at* http://www.fda.gov/iceci/inspections/ucm256377.htm.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

Investigators are instructed that "[o]bservations of questionable significance should not be listed on the FDA-483, but will be discussed with the firm's management so that they understand how uncorrected problems could become a violation."  *Id.* at 5.2.3. Investigators may note whether an observation is recurring or not corrected (*i.e.* a "repeat observation"), but this notation is not required.  *Id.*

72.     At the end of the inspection process, FDA investigators must present a hard copy of the Form 483 to the highest-ranking "owner, operator or agent in charge." *Id.* at 5.2.3.6.1. The Operations Manual requires that "[a]fter completion of the inspection," investigators also "meet with the highest ranking management official possible to discuss [the FDA agent's] findings and observations.  The FDA [Form] 483 is not a substitute for such discussion since there may be additional questionable practices or areas not appropriate for listing on this form." *Id.* at 5.2.7.  Agents must discuss separately each observation listed on the Form 483 and explain that the observations are of:

> objectionable conditions found during the inspection, [while] explain[ing] the significance of each .... [and trying] to relate each listed condition to the applicable sections of the laws and regulations administered by the FDA. [Agents should] inform management during the closeout discussion the conditions listed may, after further review by the Agency, be considered to be violations of the Food, Drug and Cosmetic Act or other statutes. Legal sanctions available to FDA may include seizure, injunction, civil money penalties and prosecution, if establishments do not voluntarily correct serious conditions.

*Id.*

73.     Management has fifteen days to provide written responses to the Form 483 observations; and a company's response may affect the FDA's final determination of subsequent action.  *Id.*  Where responses to a Form 483 are found to be inadequate, the FDA may issue a Warning Letter.

### c.     **Warning Letters**

74.     The FDA defines a Warning Letter as:

A Warning Letter is a correspondence that notifies regulated industry about violations that FDA has documented during its inspections or investigations. Typically, a Warning Letter notifies a responsible individual or firm that the Agency considers one or more products, practices, processes, or other activities to be in violation of the Federal Food, Drug, and Cosmetic Act (the Act), its implementing regulations and other federal statutes. Warning Letters should only be issued for violations of regulatory significance, i.e., those that may actually lead to an enforcement action if the documented violations are not promptly and adequately corrected. A Warning Letter is one of the Agency's principal means of achieving prompt voluntary compliance with the Act.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

FDA, Regulatory Procedures Manual 4.1 (July 2012) (emphasis added).[10]  Prior to issuing a Warning Letter, the FDA considers several factors, including: (1) "The firm's compliance history, *e.g.*, a history of serious violations, or failure to prevent the recurrence of violations;" (2) "The nature of the violation, *e.g.*, a violation that the firm was aware of (was evident or discovered) but failed to correct;" and (3) "The overall adequacy of the firm's corrective action and whether the corrective action addresses the specific violations...."  *Id.* at 4-1-3. Most importantly, the FDA's policy requires that "a Warning Letter should not be issued if the agency concludes that a firm's corrective actions are adequate and that the violations that would have supported the letter have been corrected." *Id.*

75.     Whether the problems giving rise to a Warning Letter have been solved is decided by the FDA district office after the next onsite inspection, the timing of which the FDA decides. *Id.*  Warning Letters are fully resolved when the FDA issues a "Warning Letter close-out letter" which "will not be issued based on representations that some action will or has been taken. The corrective actions must actually have been made and verified by FDA." *Id.* at 4-1-8. The FDA's policy is that district offices "should issue close-out letters within a total of 65 working days of having the necessary information upon which to make a decision." *Id.*

### 4.     The Company's Long History of FDA Violations Under Defendants' Watch

76.     STAAR has a long history, predating the Relevant Period, of failing to follow FDA Quality System Regulations.  These severe violations have repeatedly delayed the approval of key products that are the lifeblood of the Company.  The Company, under the defendants' direction and/or control, also has a history of concealing such FDA findings from investors.

#### a.     Delay of STAAR's Myopic VISIAN Implantable Contact Lens Caused by the Company's Violations of FDA Quality System Regulations

77.     The history of concealment of regulatory violations at STAAR goes back more than a decade. On October 3, 2003, the FDA Ophthalmic Devices Panel recommended that the FDA approve STAAR's Myopic VISIAN Implantable Contact Lens (or "MICL").  Based on those recommendations,

---

[10]     *Available at* http://www.fda.gov/iceci/compliancemanuals/regulatoryproceduresmanual/default.htm.

U.S. approval of the MICL appeared likely in late 2003.  At that time none of STAAR's implantable lenses had been approved by the FDA.  However, Defendants did not inform investors that approval had been delayed when the FDA warned the Company of possible enforcement action as a result of significant violations of FDA Quality System Regulations and Medical Device Reporting Regulations.

78.     Specifically, during an inspection of the Company's Monrovia facility between August 12 - September 4, 2003, the FDA observed deficiencies related to the manufacturing and quality assurance systems of CGMP requirements as set forth in the Quality System Regulation of 21 CFR 820. The FDA inspector identified these violations in a Form 483, which was presented to management on September 4, 2003.  The violations included (i) failure to ensure that complaints regarding MICL were reviewed, evaluated, and investigated as required by 21 CFR 820.198(c); (ii) failure to establish and maintain procedures for assuring that the methods used to test MICL had been validated as required by 21 CFR 8 820.80(b); (iii) failure to develop, maintain, and implement written Medical Device Reporting procedures as required by 21 CFR 803.17(a)(1) and 803.3(r), including failure to inform the FDA of serious injuries attributed to the IOL/MICL.  ***Defendants did not disclose these serious violations to investors.***

79.     Then on December 22, 2003, the FDA issued a Warning Letter to the Company regarding these same violations.  Again, Defendants did not disclose the Warning Letter to investors.

80.     Instead, investors learned of the Company's violations only after the FDA published the Warning Letter on its website on January 6, 2004.  On this news, the Company's stock price plummeted 17.5% from $11.18 on January 5, 2004 to $9.22 on January 6, 2004.

81.     In a January 7, 2004 conference call addressing the Warning Letter, then-CEO David Bailey, who stated that he was taking "personal responsibility" for overseeing the Company's compliance with FDA regulations, acknowledged that the Company would need to "address potential underlying failures in the system", and that he was "really focused on the potential delay to the U.S. approval of the ICL by not getting these compliance issues."

82.     During the call analysts openly criticized the Company for sitting on such material information.  For example, on analyst stated that "it may be that the response [to the FDA] that you

- 22 -

1   have to generate could delay the approval of your next product [MICL]. . . seems to be pretty material

2   to me, material information."

3        83.   As a follow-up to the Warning Letter, the FDA conducted a re-audit of the Monrovia

4   facility. Having apparently learned its lesson from its prior cover-up, on September 29, 2004,

5   Defendants announced in a Form 8-K that the FDA completed the re-audit of the Company's Monrovia

6   facility on September 23, 2004, and that the FDA issued a Form 483 containing an astounding 36

7   observed deviations from FDA requirements in the areas of production and process controls, corrective

8   and preventative action, quality system requirements, statistical techniques, complaint handling system,

9   medical device reporting, design controls, acceptance criteria, and document controls and records. As a

10   result, STAAR's shares fell 38% from $5.03 to $3.10.

11        84.   Defendants delivered their response to the FDA on November 5, 2004. In a Form 10-Q

12   filed with the SEC on November 10, 2004, Defendants recognized that "Until the FDA is satisfied with

13   our response, it is unlikely to grant us approval to market the VISIANTM ICL in the United States."

14        85.   On July 11, 2005, Defendants announced that on July 5, 2005, STAAR received a letter

15   from the FDA regarding the September 23, 2004 observations and STAAR's November 5, 2004 letter

16   responding to the Form 483 observations (which STAAR updated by letter on February 11, 2005). The

17   FDA letter requested that STAAR provide additional information related to the Form 483 observations,

18   and presented the FDA's conclusion that based on STAAR's earlier responses STAAR had "failed to

19   adequately correct numerous violations" noted in the Form 483. The FDA Letter gave STAAR ten

20   calendar days from its receipt of the letter to provide responses and supporting documentation.

21   Defendants acknowledged that "the FDA is unlikely to approve marketing of the VISIAN ICL in the

22   U.S. while enforcement or other similar proceedings are pending. In part, this is because STAAR must

23   be deemed compliant with the FDA's Quality System Regulations and Medical Device Reporting

24   Regulations before final marketing approval of the VISIAN ICL will be authorized." On this news,

25   STAAR's shares fell 40%, closing at $3.51 on July 11, 2005.

26        86.   Ultimately, the FDA did not approve STAAR's VISIAN ICL until December 22, 2005,

27   over 2 years after the FDA panel recommended approval.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

**b.   Delay of STAAR's Toric Implantable Contact Lens Caused by the Company's Violations of FDA Quality System Regulations**

87.   After STAAR's MICL was finally approved, the Company began the approval process for its next product, VISIAN Toric Implantable Collamer Lens (TICL).   While MICL can correct myopia (nearsightedness), TICL can correct both myopia and blurry vision associated with astigmatism. TICL had been marketed outside the United States since 2001.

88.   Approval of TICL in the U.S. was of the utmost importance to STAAR.   There was no approved phakic IOL in the U.S. for the correction of astigmatism.   In the foreign markets in which the MICL and TICL were in commercial use approximately 40% of the units and approximately 50% of the revenue were the TICL version.

89.   Defendants acknowledged the importance of FDA approval of TICL in its SEC filings, stating in relevant part:

> An important part of our ICL product portfolio is the TICL, a variant of the ICL that corrects both astigmatism and myopia in a single lens and that has been marketed outside the U.S. since 2001. We believe the TICL has a significant potential market in the U.S. and could accelerate growth of the overall refractive product line. . . . Without the Toric ICL, the ICL product line is not likely to reach its full market potential in the U.S.

90.   Following STAAR's submission of a Pre-Market Approval application supplement for TICL to the FDA on April 28, 2006, FDA's Bioresearch Monitoring branch ("BIMO") conducted an inspection of STAAR's clinical study procedures, practices, and documentation related to the TICL between February 15 and March 14, 2007.   BIMO inspections are part of a program designed to ensure that data and information contained in requests for Investigational Device Exemptions (or "IDE"), Premarket Approval applications, and Premarket Notification submissions (510k) are scientifically valid and accurate.   Another objective of the program is to ensure that human subjects are protected from undue hazard or risk during the course of scientific investigations.

91.   At the close of the inspection, STAAR received *eight inspectional observations* on Form 483, to which it responded on April 5, 2007.   Finding these responses once again inadequate, on June 26, 2007, the FDA's BIMO branch issued a Warning Letter to STAAR noting four areas of noncompliance observed during the BIMO inspection.   Following the receipt of the June 26, 2007

1   Warning Letter, Defendants disclosed it on June 27, 2007.  Defendants provided the Company's written

2   response to the Warning Letter to the FDA on July 31, 2007.

3        92.    On August 3, 2007, STAAR received a letter from the FDA Office of Device Evaluation

4   (or "ODE") notifying STAAR that the TICL application would be placed on "integrity hold" until

5   STAAR completed specified actions to the satisfaction of the FDA.  Noting the same deficiencies cited

6   in the June 26, 2007 Warning Letter from the BIMO Branch, and other deficiencies noted in an audit of

7   a clinical study site, ODE required STAAR to engage an independent third party auditor to conduct an

8   audit of patient records along with a clinical systems audit to ensure accuracy and completeness of data

9   before resubmitting the application.

10        93.    Like with MICL, another two-year period passed as Defendants scrambled to address the

11   myriad violations and to remove the integrity hold.  On July 21, 2009, the FDA notified the Company

12   that the FDA had removed the integrity hold on the application for approval of the TICL, and would

13   resume its consideration of the application.

**5.    Defendants Falsely Convey a Sense of Transparency Regarding the Company's FDA Compliance**

14

15        94.    Following the Company's severe and widespread violations of FDA Quality System

16   Regulations and its failure to timely disclose such violations, Defendants convinced investors that

17   following the lifting of the integrity hold the Company was in compliance with FDA regulations and

18   was timely disclosing the results of FDA inspections, the issuance of Form 483 observations and

19   Warning Letters, creating an impression that the Company had begun an era of transparency, cleaned up

20   its act and that TICL would no longer be delayed by any known Quality System Regulation violations.

21        95.    For example, the Company's Form 10-K filed with the SEC on April 1, 2010 stated, in

22   relevant part, that:

23       The FDA's most recent general quality inspections of STAAR's facilities were regularly
24       scheduled inspections of the Nidau, Switzerland facility between June 2 and June 5,
    2009, the Monrovia, California facility, between February 23 and March 4, 2009, and a
25       post-market inspection of the Aliso Viejo, California facility on August 7, 2006. The
    recent inspection of the Nidau, Switzerland facility that concluded on June 5, 2009
26       resulted in the inspector issuing two observations of nonconformity on Form FDA-483.
    STAAR agreed with the observations and at the conclusion of the inspection both of the
27       observations were annotated as corrected and one was additionally annotated as verified.
    The recent inspection of the Monrovia, California facility that concluded on March 4,

28

2009 resulted in the issuance of three observations by the investigators of nonconformity on Form FDA-483.

96.     In the Company's 2010 Form 10-K filed with the SEC on March 2, 2011, Defendants updated the Company's regulatory compliance status under the heading *"FDA Reviews of STAAR's Quality Systems"*, adding that:

> The FDA's most recent general quality inspections of STAAR's facilities were . . . a post-market inspection of the Aliso Viejo, California facility November 22, 2010. . . . The post-market inspection of Aliso Viejo, California resulted in no observations of noncompliance. Based in part on these inspections, STAAR believes that it is substantially in compliance with the FDA's Quality System Regulations and Medical Device Reporting regulations.

97.     The Company's Form 10-K filed with the SEC on March 3, 2012 provided another update under the same heading, adding that:

> The FDA's most recent general quality inspections of STAAR's facilities were regularly scheduled inspections of . . . of the Monrovia, California facility on January 25, 2012 . . . . The inspections of the Monrovia, California . . .facilit[y] resulted in no observations of noncompliance. Based in part on these inspections, STAAR believes that it is substantially in compliance with the FDA's Quality System Regulations and Medical Device Reporting regulations.

98.     Defendants also purported to provide a detailed description of FDA regulatory events affecting the TICL since the FDA lifted the integrity hold:

> During August and September 2009, we and the FDA resolved a number of questions related to the TICL supplement in an interactive process. On February 3, 2010, we received a letter of deficiency from the FDA outlining additional questions. On August 2, 2010, we responded to the FDA's deficiency letter. After that response, we were in dialogue with the agency, working interactively to resolve a series of follow-up questions. On April 22, 2011, we responded to the questions from the agency, which concerned the basis for an increase in the number of reported patient follow-up visits following the independent third party audit of the clinical data, and have responded to additional follow-up questions after that date. On November 29, 2011, we received a letter of deficiency from the FDA further questioning the clinical data, specifically the inclusion of patient data that was obtained outside the study windows, requesting additional information on the lens design and a validation report for the Toric ICL power calculation software. After further interactions with the FDA throughout 2012, on November 15, 2012, we submitted (1) clinical data showing no statistical difference in the clinical outcomes with or without the patient data that was obtained outside the study windows, (2) engineering data regarding the lens design, and (3) a validation report for the Toric ICL power calculation software.

99.     On May 3, 2013, Defendants even provided an interim update of regulatory compliance as a "highlight" in its Form 10-Q filed with the SEC, stating that "On April 11, 2013, an FDA inspector

- 26 -

1   performed an inspection of our Aliso Viejo, California facility.  There were no findings issued on a

2   Form 483 and the inspector indicated that we would receive a 'no action indicated' report."

3       100.   In the Company's 2013 Form 10-K, filed with the SEC on March 12, 2014, Defendants

4   did not identify any FDA observed deficiencies resulting from FDA inspections of its facilities in 2013

5   or 2014 or the issuance of any Form 483s.  Rather, Defendants simply represented that the Company

6   "believes that it is substantially in compliance with the FDA's Quality System Regulations and Medical

7   Device Reporting regulations."  The Company also disclosed for the first time the extremely recent

8   news that the FDA had finally organized an advisory panel meeting to review the TICL PMA (which

9   had been submitted in 2006 and was placed on integrity hold until 2009).  The advisory panel meeting

10   was scheduled for March 14, 2014, only two days after the filing of the Form 10-K.

    **6.**    **Defendants' Complete Lack of Quality System Controls at the Monrovia Facility Following Consolidation of Operations**

    101.   Defendants misled investors into believing that the Company's days of FDA regulatory

violations were behind it, that that the Company's prior violations did not "warrant regulatory follow-up

at this time" and that the Company was "in compliance with the FDA's Quality System Regulations and

Medical Device Reporting regulations."  Defendants made these representations despite knowing that

the FDA had in August 2013 conducted an inspection of CGMP regulations at the Company's Nidau,

Switzerland facility (which had manufactured the MILC and TILC prior to transfer to the Monrovia

facility in October 2013), found multiple significant deficiencies in the Company's manufacturing

procedures, and issued a Form 483 to management.  Defendants also independently knew that the

Company was have significant and widespread quality control problems at the Monrovia facility during

the consolidation process, and that at the same time that the company was assuring the market of

regulatory compliance, the FDA had been inspecting the Monrovia facility since February 10, 2014 and

had repeatedly alerted management to severe violations of CGMP and Quality System Regulations

relating to ICL/MILC.

    **1.**    **Rampant Quality Control Issues Existed During the Consolidation of the Company's Manufacturing to the Monrovia Facility**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1    102.   As set forth above, even before STAAR's exhaustive consolidation of its far-flung

2    manufacturing operations into a single facility in Monrovia, California, the Company's quality

3    assurance practices were inadequate and, historically, STAAR had a history of violations, or failures to

4    comply with, FDA regulations.

5    103.   Upon information and belief, in 2013, the Company's consolidation of all its

6    manufacturing into one facility in Monrovia resulted in a disorganized manufacturing process.

7             **2.**     **Violations Found by the FDA But Not Disclosed by Defendants**

8    104.   In August 2013, FDA inspectors conducted an examination of the Company's Nidau,

9    Switzerland facility prior to its manufacturing operations being transferred to the Monrovia facility.

10   During that inspection, the FDA observed three significant deviations of FDA regulations.  In particular

11   (as discussed in the 2014 Warning Letter as a "repeat observation"), the FDA observed that the

12   Company did not ensure that the MICL and other devices were manufactured in accordance with the

13   device master record, and nevertheless released the products for distribution.  Pursuant to FDA standard

14   procedure, this observation was included on a Form 483, which was provided to and discussed with

15   management on August 3, 2013.  Nevertheless, this deficiency went uncorrected by management,

16   appearing again when the FDA inspected the Monrovia facility in February 2014, after manufacturing

17   had been transferred from Nidau, Switzerland.

18   105.   On February 10, 2014, the FDA began an inspection of the Company's Monrovia

19   facility.

20   106.   It became immediately apparent that the Company had no (or could not timely locate a)

21   Design History File for the ICL/MICL to demonstrate that any of the critical design controls required to

22   ensure proper and safe manufacturing of STAAR's medical devices that transferred from Switzerland

23   had been implemented. By February 21, 2014, the FDA inspector had already made "numerous"

24   requests for the Design History File without any such file being provided by the Company.  Instead,

25   "management" provided certain summary information, which the FDA immediately stated was

26   inadequate.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

107.    Similarly, after the repeated requests by the FDA for certain validation information for the unapproved software used to determine the appropriate lens size for patients for the MICL and other products, the FDA inspector interviewed "multiple firm management" prior to February 21, 2014 to determine the use and source of the unapproved software.

108.    Having established by February 21, 2014 that the Company did not have the required Design History File (and relayed this fact to management), the FDA inspector continued the examination.  At its conclusion on March 21, 2014, the FDA inspector held a close-out meeting, where a Form 483 identifying the Company's myriad violations of Quality System Regulations and Good Manufacturing Practices was presented to the Company's senior regulatory compliance person.  Those observations and the Form 483 were then relayed to Santos (to the extent he was not at the close-out meeting) and Caldwell.

109.    Specifically, under Defendants' direction and on their watch, STAAR failed to establish, maintain, implement or document Design Controls pursuant to 21 CFR 820.30(a)-(j).  To the extent that any design controls existed at all, the documentation of those controls and procedures, the Design History File, was never transferred to the U.S. when the Company transferred manufacturing of the devices from its Nidau, Switzerland facility to its Monrovia Facility in October 2013, meaning the design controls had not been implemented at the Monrovia facility.  That is, STAAR was manufacturing the MICL and other products, which were being surgically implanted into patients' eyes, without ensuring that the design used to manufacture the lenses was correct, that the actual manufacturing of the lenses was using the correct materials, or done according to any approved designs. Thus, Defendants never verified or validated that the MICL that was created at the Monrovia facility was safe and effective.

110.    The complete lack of any design controls for the manufacturing of its products resulted in at least 10 separate observed violations of FDA regulations, which were included on the Form 483 presented to management.

111.    The FDA inspector also discovered that Defendants did not conduct any risk analysis for the ICL/MICL that would identify possible hazards associated with the designs, whether as properly

- 29 -

constructed or in the event of a manufacturing error.  Nor did Defendants establish any procedure for "finished device acceptance" as required by 21 CFR 820.80(d), that is, to ensure that each production run, lot, or batch of finished MICLs meets acceptance criteria.  These violations represented two additional observations, which were included on the Form 483 presented to management.

112.  The inspector also found that the software that Defendants used to calculate the proper dimensions of the lens implanted into a patient's eye (referred to as the "controller") had not only never been validated as required by 21 CFR 820.30(g) but also the software had never been approved by the FDA.  Under Defendants management and on their watch, the Company was implanting MICLs in patients' eyes with the aid of an unapproved medical device.  This was yet another violation included on the Form 483.

113.  Defendants also failed establish any procedures for receiving, reviewing, and evaluating complaints related to the ICL/MICL as required by 21 CFR 820.198(a).  Without such procedures, the Company could not (and did not) adequately evaluate whether injuries caused by the ICL/MICL were a result of an error in manufacturing or design, which would require correction or recall of the device to prevent severe injuries to patients' eyes.  This observed deficiency was also included on the Form 483 presented to management.

114.  Despite Defendants representing that the ICL/MICL had a two year shelf-life, the FDA inspector discovered, and management admitted to the inspector, that the Company had actually never conducted any "stability study" supporting its baseless claim.  The Company did not have any procedure for determining an adequate shelf-life for the device and did not even monitor production samples for MICL lenses for shelf-life.  This violation was also included on the Form 483 presented to management.

115.  Ultimately, the FDA could no longer tolerate STAAR's widespread non-compliance and its inability to correct its repeated violations of significant FDA regulations.  As a result, on May 21, 2014, only two months after the initial inspection, the FDA through Los Angeles District Director Steven E. Porter, issued a Warning Letter to STAAR, addressed to defendant Caldwell.

**D.**  **Defendants' False and Misleading Statements**

- 30 -

116.    On November 1, 2013, Defendants caused the Company to file with the SEC its Form 10-Q for the quarter ending September 27, 2013, which reiterated the Company's previously reported financial and operational results.  In addition, the Form 10-Q also contained pursuant to Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by defendant Caldwell, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Concerning the manufacturing consolidation, the Form 10-Q stated that a "key operational metric" was "[m]anag[ing] the manufacturing consolidation with no material disruption to customer supply requirements or quality" and that "[o]ur consolidation efforts continue to proceed substantially according to our plan."

117.    The foregoing representations in ¶116 were materially false and/or misleading because defendants failed to disclose that as a result of the manufacturing consolidation:

        i.    The Company was manufacturing products at the Monrovia facility despite lacking any Design History Files for its key products, Visian ICL/MICL, at the Monrovia facility; and

        ii.    The Company lacked reliable internal audit or quality controls at the Monrovia facility.

118.    On March 12, 2014, Defendants caused the Company to file an annual report with the SEC on Form 10-K for the fourth quarter and year ended December 28, 2013 (the "2013 Form 10-K"), which was signed by, among others, defendants Caldwell, Logan, and Moore, and reiterated the Company's previously reported financial and operational results.  In addition, the 2013 Form 10-K also contained SOX Certifications signed by defendant Caldwell, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

119.    The 2013 Form 10-K represented that the "The FDA's Center for Devices and Radiological Health regularly inspects our facilities to determine whether we are in compliance with the FDA Quality System Regulation, which governs such things as manufacturing practices, validation,

1   testing, quality control, product labeling and complaint handling, and in compliance with FDA Medical

2   Device Reporting regulations and other FDA regulations."

3       120.    The Form 10-K also stated that "Our ability to continue our U.S. business depends on the

4   continuous improvement of our quality systems and constant vigilance in our compliance with FDA

5   regulations. Accordingly, our management expects to continue to devote significant resources and

6   attention to those efforts for the foreseeable future" and that the Company "believes that it is

7   substantially in compliance with the FDA's Quality System Regulations and Medical Device Reporting

8   regulations."

9       121.    The foregoing representations in ¶¶118-120 were materially false and/or misleading for

10  the reasons stated in ¶117 (i)-(ii) and because defendants failed to disclose the following:

11              iii.    During an FDA inspection of the Company's Monrovia facility, the Company

12                      had been repeatedly asked for, and was repeatedly unable to produce, Design

13                      History Files, which the Company knew was a material violation of FDA

14                      regulations;

15              iv.     The Company was utilizing a software calculator for its ICL/MICL that was not

16                      FDA approved nor validated; lacked adequate procedures for receiving,

17                      reviewing and evaluating complaints; and failed to conduct a study supporting

18                      the two year shelf-life placed on its lenses;

19              v.      Violations conveyed by FDA inspectors to management during the August 2013

20                      inspection of the Company's Switzerland facility remained unremedied; and

21              vi.     As a result of the foregoing, the Company's ability to secure approval of any

22                      new drug products or devices – specifically, the Company's TICL – was

23                      materially at risk of being delayed or denied.

24      122.    Concerning the manufacturing consolidation, the Form 10-K stated that a "key

25  operational metric" was "[m]anag[ing] the manufacturing consolidation with no material disruption to

26  customer supply requirements or quality" and that "[o]ur consolidation efforts continue to proceed

27  substantially according to our plan."

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

123.     Regarding the transfer of its manufacturing operations from Switzerland to Monrovia, regulatory compliance and design controls, the Form 10-K acknowledged that design controls must be in place so that the Monrovia facility could manufacture the MILC and other devices, stating "we have placed a priority on maintaining the continuity and quality of our product supply":

> In our major markets, regulatory approval to sell our products is generally limited to the current manufacturing site, and changing the site will require applications to and approval from regulatory bodies prior to commercialization. To satisfy our own quality standards as well as regulations, we must follow strict protocols to confirm that products made at a new site are equivalent to those made at the currently approved site. Even minor changes in equipment, supplies or processes require validation.

124.     The foregoing representations in ¶¶122-123 were materially false and/or misleading for the reasons stated in ¶¶117 and 121.

125.     On March 14, 2014, Defendants presented their case for approval of TILC to an independent advisory panel to the FDA. In this presentation, CEO Defendant Caldwell told the panel that the Company had improved its regulatory compliance, stating that in the last two years only one of four inspections of the Company's various facilities resulted in negative observations by the FDA and that the inspection that resulted in observations did not "warrant regulatory follow-up at this time."

126.     The foregoing representations in ¶125 were materially false and/or misleading for the reasons stated in ¶¶117 and 121.

127.     On March 17, 2014, Defendants announced that an independent advisory panel to the Food and Drug Administration recommended marketing approval for its TILC, bringing it closer to a long-awaited U.S. launch.

128.     In response to this seemingly unilaterally positive news, *Reuters* published an article the same day, stating "Staar Surgical Co said an independent advisory panel to the Food and Drug Administration recommended marketing approval for its implantable lens, bringing it closer to a long-awaited U.S. launch and sending the company's shares up 27 percent." Analysts at Canaccord Genuity said they expect regulatory approval for the lens in the second half of 2014, adding that "the positive FDA panel is the first of several important milestones on the horizon for Staar." Analysts at Canaccord Genuity raised their rating on the stock to "buy" from "hold" and the price target to $20 from $14. "We have always viewed the Food and Drug Administration panel as more of a wild card than the FDA, and

1  we ultimately expect the FDA to approve the device," Benchmark analyst Jan Wald said, raising his

2  price target on STAAR's stock to $21 from $15.

3      129.  As a result of this news, the Company's stock price increased $2.33, or 15.2%, from

4  $15.37 on Friday March 14, 2014 to $17.70 on Monday March 17, 2014, with intra-day trading sending

5  the company's shares up as much as 27%.

6      130.  The foregoing representations in ¶127 were materially false and/or misleading for

7  reasons stated in ¶¶117 and 121.

8      131.  On May 5, 2014, Defendants caused the Company to file a Proxy Statement on Schedule

9  14A, which stated "STAAR's standing with the FDA and other regulators, and its reputation with

10  customers depends on maintaining a corporate culture that emphasizes compliance at all levels, and

11  STAAR aims for continuous improvement in the quality of its processes and products.  Engrained in the

12  performance of executives and employees at every level is a special emphasis on that contribution."

13      132.  The foregoing representations in ¶131 were materially false and/or misleading for the

14  reasons stated in ¶¶117 & 121, and because on March 21, 2014, following the FDA inspection of the

15  Company's Monrovia facility, the FDA inspector presented management with a Form 483, which

16  identified over 15 significant violations of FDA regulations, demonstrating that the Company had

17  significantly violated the FDA Quality System Regulation and that the consolidation of manufacturing

18  operations to the Monrovia facility had resulted in widespread quality control violations.

19      133.  On May 13, 2014, Defendants caused the Company to file a quarterly report for the first

20  quarter of 2014 on Form 10-Q with the SEC ("2014 1Q Form 10-Q"), which was signed by defendant

21  Caldwell, and reiterated the Company's previously reported financial and operational results.  In

22  addition, the 2014 1Q Form 10-Q also contained SOX Certifications signed by defendant Caldwell,

23  stating that the financial information contained in the Form 10-Q was accurate and disclosed any

24  material changes to the Company's internal control over financial reporting.  The 2014 1Q Form 10-Q

25  also noted that the "consolidation efforts are proceeding according to plans and we expect this to

26  continue through completion in the middle of 2014."

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

134.     The foregoing representations in ¶133 were materially false and/or misleading for the reasons stated in ¶¶117, 121 & 132.

135.     Receipt of Warning Letter - Having previously made statements regarding the Company's compliance with FDA regulations, as well as announced the Advisory Panel's recommendation to approve TICL, defendants were duty bound to disclose the receipt of the Warning Letter on May 21, 2014.  Their failure to do so was a material omission, consistent with their pattern in in the prior decade when they continuously concealed adverse FDA findings, but disclosed when the Company was given a clean bill of health.

**E.     The Truth Begins to Emerge**

136.     On June 30, 2014, the FDA published the Warning Letter, dated May 21, 2014, concerning the inspection of STAAR's Monrovia facility that took place from February 10, 2014 to March 21, 2014.  The FDA letter noted several regulatory violations at the Monrovia facility.

137.     Specifically, the FDA Warning Letter stated that the Company's medical devices were "adulterated" because the "methods used in, or the facilities or controls used for, their manufacture, packing, storage or installation are not in conformity with the CGMPs requirements of the Quality System Regulation found at Title 21, Code of Federal Regulations (CFR), Part 820."

138.     The FDA further advised STAAR that "failure to promptly correct these violations may result in regulatory action being initiated by the FDA without further notice" and that any premarket approval application for Class III devices – such as the Company's Toric Implantable Collamer Lens ("TILC") which had been pending since 2006 and had recently been recommended for approval by an FDA advisory panel – "will not be approved until the violations have been corrected."

139.     On this news, STAAR shares declined $2.95 or nearly 17.5%, to close at $13.85 on July 2, 2014.

140.     On July 31, 2014, Defendants caused the Company to file with the SEC its Form 10-Q for the three month period ending July 4, 2014.  Addressing the issue of the Warning Letter for the first time, the Company acknowledged that "past quality system deficiencies observed at certain of our facilities have led to FDA Warning Letters and the issuance of such Warning Letters may delay our

- 35 -

efforts to obtain new product approvals while we resolve the deficiencies citied therein." Defendants also disclosed for the first time that in a letter dated July 3, 2014 the SEC advised the Company that it had begun an informal inquiry into the Company's compliance with securities laws, requesting documents concerning "any FDA inspections, investigations, observations, noted violations, or warnings since January 1, 2014."

141.   In an earnings call on the same date, CEO Caldwell discussed the Warning Letter, disclosing for the first time that the Company's Nidau, Switzerland facility had been inspected in August 2013, just before operations were moved to Monrovia, and the FDA had observed three deficiencies.  And in response to a question from an analyst as to whether the FDA Warning Letter would delay the approval of TICL, defendant Caldwell said "how would this impact the Toric ICL?  We don't know. We don't have any indication, as we said here today, one way or the other."

142.   On this news, the Company's stock price dropped again, plummeting another $2.00, or 15.5%, from $12.87 on July 31, 2014 to $10.87 on August 1, 2014.

143.   Despite Defendants reporting second quarter revenues ahead of expectations, the market understood that the Company's rampant FDA violations would once again delay the approval of TILC to some unknown date in the future.  An analyst for William Blair wrote:

> A clear focus on the call was an update on the company's recently released warning letter related to its Monrovia manufacturing facility. The real concern with respect to the warning letter was whether this issue would delay the approval of the company's toric ICL in the United States and the manufacturing of this product. . . . While we believe the product will ultimately be approved, management did not provide specific timing and therefore we are not incorporating the toric ICL in our numbers for 2014, and only including about $5 million next year.

144.   After this news, STAAR's stock dropped $11.05 per share to close at $19.08 per share on September 24, 2012, a decline of 37%.

145.   As a result of Defendants' false and misleading statements, STAAR stock traded at artificially inflated levels.

146.   Further, as a result of Defendants' breaches of fiduciary duty and other misconduct, the price of the Company's stock still has not recovered and currently trades for around $5.60 per share.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

## DERIVATIVE AND DEMAND ALLEGATIONS

147.     Plaintiff brings this action derivatively in the right and for the benefit of STAAR to redress the breaches of fiduciary duty and other violations of law by Defendants.

148.     Plaintiff will adequately and fairly represent the interests of STAAR and its shareholders in enforcing and prosecuting its rights.

149.     The Board currently consists of the following seven (8) directors: defendants Logan, Farrell, Mason, Meier, Moore, Roush, Silverman, and Wall.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

(a)     At all relevant times, defendants Meier, Moore, and Roush served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  Defendants Meier, Moore, and Roush breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  Therefore, defendants Meier, Moore, and Roush each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

(b)     The principal professional occupation of defendant Mason is his employment with STAAR as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed on May 27, 2015 (the "2015 Proxy"), Defendants have admitted that defendant Mason is not independent.  Thus, defendant Mason lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action; and

(c)     Defendants Caldwell, Logan, and Moore each signed the false and misleading Form 2013 10-K.  The Form 2013 10-K was false and misleading because (among other things) it

- 37 -

utterly failed to disclose significant details listed in ¶121 and contained misleading statements regarding the Company's internal controls.  Therefore, Caldwell, Logan, and Moore each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that STAAR disseminated accurate, truthful and complete information to its shareholders.

152.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to STAAR shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

153.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

154.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

155.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

156.   Defendants willfully ignored the obvious and pervasive problems with STAAR's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

157.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

158.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.   Defendants owed and owe STAAR fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe STAAR the highest obligation of good faith, fair dealing, loyalty and due care.

160.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

161.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, STAAR has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

162.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

163.   Plaintiff, on behalf of STAAR, has no adequate remedy at law.

## COUNT IV

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

164.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of STAAR.

166.   Plaintiff, as a shareholder and representative of STAAR, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other

- 39 -

1   compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and

2   fiduciary breaches.

3   **COUNT V**

4   **AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

5   167.   Plaintiff incorporates by reference and realleges each and every allegation contained

6   above, as though fully set forth herein.

7   168.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and

8   influence STAAR, for which they are legally responsible.   In particular, Defendants abused their

9   positions of authority by causing or allowing STAAR to misrepresent material facts regarding its

10   financial position and business prospects.

11   169.   As a direct and proximate result of Defendants' abuse of control, STAAR has sustained

12   significant damages.

13   170.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

14   171.   Plaintiff, on behalf of STAAR, has no adequate remedy at law.

15   **COUNT VI**

16   **AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

17   172.   Plaintiff incorporates by reference and realleges each and every allegation set forth

18   above, as though fully set forth herein.

19   173.   Defendants had a duty to STAAR and its shareholders to prudently supervise, manage

20   and control the operations, business and internal financial accounting and disclosure controls of

21   STAAR.

22   174.   Defendants, by their actions and by engaging in the wrongdoing described herein,

23   abandoned and abdicated their responsibilities and duties with regard to prudently managing the

24   businesses of STAAR in a manner consistent with the duties imposed upon them by law.   By

25   committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and

26   candor in the management and administration of STAAR's affairs and in the use and preservation of

27   STAAR's assets.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

175.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused STAAR to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to STAAR, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged STAAR.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing STAAR to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to STAAR restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 21, 2016                    THE WEISER LAW FIRM, P.C.


                                   _____/s/ KATHLEEN A. HERKENHOFF_____
                                   KATHLEEN A. HERKENHOFF (168562)

- 41 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 794-1441
Facsimile: (858) 794-1450
kah@weiserlawfirm.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT STECKER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

Counsel for Plaintiff

- 42 -

## STAAR SURGICAL COMPANY VERIFICATION

I, Kevin Forestal, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 06 03 2016

Kevin Forestal